**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **FEDERAL INSURANCE COMPANY** | § | |
| | § | |
| **Plaintiff** | § | |
| **v.** | § | **CIVIL ACTION NO. 4:25-cv-01992** |
| | § | |
| **JAMES RIVER INSURANCE, COMPANY** | § | |
| | § | |
| **Defendant** | § | |

**FEDERAL INSURANCE COMPANY'S**
**MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

*/s/ Christopher P. Hemphill*
MARCIE L. SCHOUT
State Bar No. 24027960
**QUILLING, SELANDER, LOWNDS, WINSLETT & MOSER, P.C.**
2200 Ross Ave., Suite 2200
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Facsimile)
mschout@qslwm.com

Christopher P. Hemphill (admitted pro hac vice)
**COHN BAUGHMAN**
525 West Monroe Street, Suite 1500
Chicago, IL 60661
(312) 753-6616 (office)
(708) 602-5118 (preferred)
christopher.hemphill@mclolaw.com

ATTORNEYS FOR PLAINTIFF
FEDERAL INSURANCE COMPANY

# TABLE OF CONTENTS


NATURE AND STAGE OF THE PROCEEDINGS .......... 1

STATEMENT OF THE ISSUES .......... 1

SUMMARY OF THE ARGUMENT .......... 2

STATEMENT OF UNDISPUTED FACTS .......... 4

I. BRIEF INSURANCE SUMMARY .......... 4

II. FEDERAL COVERAGE .......... 4

III. JAMES RIVER COVERAGE .......... 5

IV. THE MASTER SERVICE AGREEMENT BETWEEN TOTAL AND PARSLEY .......... 5

V. TOTAL'S BUSINESS IN THE OILFIELDS .......... 6

VI. TOTAL RETAINED RAMIREZ AS AN INDEPENDENT CONTRACTOR .......... 6

VII. THE UNDERLYING SUIT .......... 7

VIII. RELEVANT DEFENSES AND TENDERS .......... 7

IX. SETTLEMENT .......... 8

X. FEDERAL STEPS UP FOR PARSLEY AND THE INSURERS RESERVE RIGHTS .......... 8

ARGUMENT AND AUTHORITIES .......... 8

I. FEDERAL MOVES FOR SUMMARY JUDGMENT ON THE CLAIMS IN ITS COMPLAINT .......... 8

II. JAMES RIVER'S CLAIMS FAIL AS A MATTER OF LAW BECAUSE RAMIREZ WAS NOT AN EMPLOYEE OF PARSLEY AND DID NOT QUALIFY AS AN INSURED UNDER THE FEDERAL POLICY .......... 9

A. There is No Contract for Hire Between Parsley and Ramirez .......... 10

1. There is No Direct Contract for Hire .......... 10

2. There is No Indirect Contract for Hire .......... 11

a. Both Independent Contractor Agreements Are Controlling Because They Are Not Shams or Subterfuge………………………………………...….11

b. Master Service Agreements Are a Widespread, Standard Contract Throughout the Oil and Gas Industry, Where Company Men Are Independent Contractors ......................................................................... 12

c. The Borrowed Employee Doctrine Has No Relevance to an Insurance Policy to Create an Indirect Contract for Hire…………………………...13

B. Parsley Treated Ramirez As An Independent Contractor, and Parsley Did Not Assert Control Over The Details of Ramirez's Work……………………………15

1. Parsley Did Not Control Ramirez in Practice……………………………......16

2. Parsley's Interactions with Ramirez Did Not Make Him an Employee...…...17

3. Even If Parsley Did Assert Some Sort of Control Over Ramirez, The Borrowed Employee Doctrine Does Not Apply Because Texas Law Requires That the Alleged Control Must Cause the Accident…………………………18

III. ALTERNATIVELY, IF THE COURT RULES THERE IS A FACT ISSUE ABOUT WHETHER COVERAGE EXISTS UNDER THE FEDERAL POLICY, THEN JAMES RIVER AND FEDERAL ARE CO-INSURERS AND THE LOSS MUST BE ALLOCATED PRO RATA BY LIMITS……………………………………......20

CONCLUSION……………………………………………………………………………..21

## ALPHABETICALLY ARRANGED TABLE OF CITATIONS

### CASES


*Am. Nat'l. Ins. Co. v. Denke,* 95 S.W.2d 370 (Tex. 1936) .......... 19

*Bell v. VPSI, Inc.*, 205 S.W.3d 706 (Tex. App.—Fort Worth 2006, no pet.) .......... 18

*Case v. Omega Natchiq*, *Inc.*, No. H-08-0835, 2008 U.S. Dist. LEXIS 52931, at *6 (S.D. Tex. July 10, 2008) .......... 12

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......... 2

*Clark v. America's Favorite Chicken Co*., 110 F.3d 295 (5th Cir. 1997) .......... 17

*Dillon Gage Inc. of Dall. v. Certain Underwriters at Lloyd's, Subscribing to Policy No. EE1701590*, 440 F. Supp. 3d 587 (N.D. Tex. 2020) .......... 14

*Domino's Pizza, L.L.C. v. Reddy*, No. 09-14-00058-CV, 2015 Tex. App. LEXIS 2578, at *14-15 (Tex. App.—Beaumont Mar. 19, 2015, pet. denied) .......... 18

*Dow Chem. Co. v. Bright*, 89 S.W.3d 602 (Tex. 2002) .......... 18

*Forge Corp. v. Jones*, 214 S.W.3d 693 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ... 18

*Francis v. Coastal Oil & Gas Corp*., 130 S.W.3d 76 (Tex. App.—Houston [1st Dist.] 2003, no pet.) .......... 13

*GE Oil & Gas Pressure Control, L.P. v. Carrizo Oil & Gas, Inc*., No. 01-21-00285-CV, 2023 Tex. App. LEXIS 3366, at *9 n.5 (Tex. App. May 18, 2023, pet. denied) .......... 12

*GE v. Moritz*, 257 S.W.3d 211 (Tex. 2008) (accord) .......... 19

*Godines v. Parsley Energy Operations, LLC*, No. 11-16-00139-CV, 2018 Tex. App. LEXIS 3961, at *2 (Tex. App.—Eastland May 31, 2018, no pet.) .......... 13

*Green, Inc. v. Questor Drilling Corp*., 946 S.W.2d 907 (Tex. App.--Amarillo 1997, no pet.) .... 12

*Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exch.,* 444 S.W.2d 583 (Tex. 1969) ....... 21

*Hassell Constr. Co. v. Springwoods Realty Co*., No. 01-17-00822-CV, 2023 Tex. App. LEXIS 1449 (Tex. App.—Houston [1st Dist.] Mar. 7, 2023, pet. denied) .......... 14

*Irani Eng'g, Inc. v. Arcadia Gas Storage, LLC*, No. 01-21-00113-CV, 2022 Tex. App. LEXIS 6176, at *18-19 (Tex. App.—Houston [1st Dist.] Aug. 23, 2022, no pet.) .......... 11

*Johnston v. Oiltanking Houston, L.P.*, 367 S.W.3d 412 (Tex. App.—Houston [14th Dist.] 2012, no pet.) .......... 18

*Langfitt v. Fed. Marine Terminals, Inc.*, 647 F.3d 1116 (11th Cir. 2011).......... 14

*Lightering LLC v. Teichman Grp.*, 328 F. Supp. 3d 625 (S.D. Tex. 2018) .......... 12

*Lone Star Well Serv. LLC v. RMTDC Operations*, 731 S.W.3d 93, ft. 5 (Tex. App.--Eastland 2026, no pet.) .......... 7

*Nat'l W. Life Ins. Co. v. Newman*, No. 02-10-00133-CV, 2011 Tex. App. LEXIS 8184, at *22 (Tex. App.—Fort Worth Oct. 13, 2011, pet. denied).......... 20

*Plotkin v. Joekel*, 304 S.W.3d 455 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) .......... 10

*Quintanilla v. A & R Demolition, Inc.*, No. H-04-1965, 2006 U.S. Dist. LEXIS 12264 (S.D. Tex. Mar. 6, 2006).......... 17

*Shell Oil Co. v. Khan*, 138 S.W.3d 288 (Tex. 2004) .......... 17

*Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747 (5th Cir. 2022) .......... 2

*Stimson v. Aetna Ins. Co.*, 440 S.W.2d 108, 111 (Tex. App.—Dallas 1969, no writ).......... 15

*United States v. Baker*, No. A-13-CR-346-SS, 2014 U.S. Dist. LEXIS 207064, at *6 (W.D. Tex. Apr. 11, 2014) .......... 11

*Vanterpool v. Hess Oil V.I. Corp.*, 589 F. Supp. 334 (D.V.I. 1984).......... 14

*White v. DR & PA Deliverance, Ltd.*, No. 01-12-00227-CV, 2014 Tex. App. LEXIS 2091, at *5-6 (Tex. App.—Houston [1st Dist.] Feb. 25, 2014, no pet.) .......... 16

## NATURE AND STAGE OF THE PROCEEDING

Federal filed this suit, asserting that James River Insurance Company ("James River") covered Federal's named insured, Parsley Energy Operations LLC ("Parsley"), as an additional insured and James River should have contributed to an underlying bodily injury settlement on behalf of Parsley. James River insured RMTDC LLC d/b/a Total Energy Services, LLC ("Total"), which was a subcontractor of Parsley.

James River responded by asserting a counterclaim, contending that an independent contractor of Total named Daniel Ramirez was an employee of Parsley and therefore qualified as an insured under the Federal policies issued to Parsley. In James River's view, James River paid a settlement for Ramirez and Total that Federal should have paid instead of James River.

The Court's scheduling order provided for James River to file an affirmative motion for summary judgment, Federal to respond, Federal to file its own affirmative motion for summary judgment, and for James River to respond to Federal's motion. (ECF 31). The case is now ready for resolution and Federal moves for summary judgment on the affirmative claims it asserts in its complaint (ECF 1) and the counterclaims asserted by James River (ECF 24). James River only moved for summary judgment on the affirmative claims asserted by Federal in its complaint, but did not move on its counterclaims. (ECF 38).

## STATEMENT OF THE ISSUES

Issue 1: Is Federal entitled to summary judgment on its affirmative claims for reimbursement from James River for the reasons discussed in the Response (ECF 39) to James River's motion for summary judgment?

Issue 2: Does Ramirez trigger insured status under the Federal policy by qualifying as an "employee" of Parsley?

Standard of Review: "Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 749 (5th Cir. 2022). "A fact is material if it 'might affect the outcome of the suit.'" *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019), as revised (Jan. 25, 2019) (citations omitted). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* The movant is entitled to judgment as a matter of law when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## SUMMARY OF THE ARGUMENT

To be an insured under the Federal policy, Ramirez must qualify as an "employee" of Parsley, as defined by the Federal policy. This analysis will be driven by the common, ordinary meaning of the word "employee", which requires the purported employee to be working under a "contract of hire" under which Parsley has the "right to control" the purported employee. (ECF 34, p. 8). Because Ramirez does not qualify as an employee, Ramirez does not qualify as an insured under the Federal policy and Federal owes no coverage to Ramirez. And by extension, Federal owes no reimbursement to James River.

It is undisputed that no direct contract of hire exists between Parsley and Ramirez. Parsley retained Total as an independent contractor under a master service agreement to provide goods and services to Parsley (the "Parsley-Total MSA"). As one example of services, Total contracted with Ramirez to be an independent contractor under a consulting agreement and Total provided Ramirez to Parsley (the "Total-Ramirez Consulting Agreement"). Therefore, the only direct contracts are between Parsley and Total, and separately, between Total and Ramirez.

Given the lack of a direct contract, the only potential contract of hire would be an "indirect" contract. However, only two relevant contracts exist: the Parsley-Total MSA and the Total-Ramirez Consulting Agreement. These contracts make Total an independent contractor responsible for the work of anyone it retains and make Ramirez into an independent contractor of Total, who is responsible for his own work. Under Texas law, these arms-length contracts are neither shams nor subterfuge and no reason exists for them to be set side. Therefore, there is no basis for finding a direct or indirect contract for hire exists between Parsley and Ramirez.

Regardless, if the Court reaches the issue of "right to control", the contracts make clear that Parsley did not have a right control Ramirez. Moreover, the borrowed employee doctrine does not apply because that doctrine requires Parsley to have controlled Ramirez to such an overwhelming extent that he became an employee. That did not happen here where the record is clear that Parsley consistently treated Ramirez as an independent contractor. Texas law prohibits disregarding independent contractor status unless the control of the independent contractor is exceptionally persistent and the independent contractor clearly acquiesces. That standard is not met here where among other things, Ramirez agreed he was a "mercenary" working for himself, that Parsley did not give any detailed instruction to him about how to do his work, and that Parsley would give him general goals to achieve without telling him how to get there.

Further, in order for the borrowed employee doctrine to apply, Texas law also requires that Parsley's alleged control be directly tied to the injury that Ramirez's alleged negligence caused. The idea is that an employer should not escape liability if someone slipped on water after an employer directed a borrowed employee to mop in that area. However, in this situation, James River has not offered any evidence that Parsley's purported "control" is specifically connected to the power swivel accident that caused Mr. Salmons' injuries.

Therefore, as more fully articulated below, this Court should grant summary judgment to Federal on the affirmative claims in Federal's complaint and against James River's counterclaims.

## STATEMENT OF UNDISPUTED FACTS

### I. BRIEF INSURANCE SUMMARY

| **Insurer** | **Named Insured** | **Primary Limit** | **Excess Limit** |
|---|---|---|---|
| Federal | Parsley | $1M | $20M |
| James River | Total | $1M | $10M |
| GMIC/QBE | Lone Star | $1M | $10M |

### II. FEDERAL COVERAGE

Federal issued a $1,000,000 occurrence limit general liability policy to Parsley with a policy period of August 1, 2017 to August 1, 2018 (the "Federal Primary Policy"). The "Who Is An Insured" provision states that Parsley's "**employees** are **insureds**…" (APPENDIX305) (emphasis in original). Employee is defined as follows:

> **Employee** includes a **leased worker**. **Employee** does not include a **temporary worker**.

(APPENDIX322) (emphasis in original).[1]

---

[1] No party contends Ramirez is a leased worker or a temporary worker. (APPENDIX1171-1172) ("Q. Does James River assert that Ramirez is a temporary worker? No. Q. Does James River assert that Ramirez is a leased worker? MS. JOHNSON: Objection. Calls for a legal conclusion. THE WITNESS: No, we do not.") Instead, James River asserts that Parsley controlled Ramirez to such an extent as to make him an employee. (APPENDIX1171). See also ECF 28, p. 3-4 (basing coverage theory on right to control); ECF 22-1 (same).

Nevertheless, Ramirez could not qualify under the "leased worker" provision for at least three reasons. First, Ramirez is Total's independent contractor, not its employee. Independent contractors cannot be leased. *Nat'l Cont'l Ins. Co. v. Vukovic*, 386 F. Supp. 3d 918, 924-25 (N.D. Ill. 2019) (independent contractor can't be leased employee, especially where party trying to undermine independent contractor status previously agreed on independent contractor status); *Nationwide Prop. & Cas. Ins. Co. v. Brinley's Grading Serv.*, 225 N.C. App. 531, 737 S.E.2d 192 (2013) (independent contractor can't be leased employee). Second, the Parsley-Total MSA is a broad "goods and services" contract, not an agreement between a labor leasing firm and Parsley. Third, Total is not a "labor leasing firm" as the "leased worker" definition requires. For example, in Texas, labor leasing firms are known under the Professional Employer Organization Act (former known as the "Staff Leasing Services Act") as "professional employer services" (formerly known as "staff leasing services companies"). See Tex. Lab. Code § 91.001(14). That Act regulates the employee-leasing market. *Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 397 (Tex. 2016). Total is radically different from one of these staff leasing companies given that Total provided many services in the oil and

## III. JAMES RIVER COVERAGE

James River issued a $1,000,000 per occurrence general liability policy to Total, with a period of July 20, 2017 to July 30, 2018 (the "James River Primary Policy"). (APPENDIX475-656). The policy provides coverage to "employees" and an endorsement to the policy expands the definition of employee to mean:

> "Employee" includes a "leased worker" <u>and independent contractors</u> but only as respects work performed within the course and scope of their employment for the Named Insured…

(*Id.* at p. APPENDIX557) (emphasis added).

## IV. THE MASTER SERVICE AGREEMENT BETWEEN TOTAL AND PARSLEY

Parsley and Total entered into a master service agreement (previously identified as the Parsley-Total MSA) on November 13, 2009 under which Total agreed to provide "goods and services" to Parsley. (APPENDIX658). Pursuant to paragraph 8, Total is an independent contractor. In full, this section states that

> 8) <u>Independent Contractor.</u> Nothing contained in this Agreement shall be construed to constitute Contractor as a partner, employee or agent of Company, nor shall either party have any authority to bind the other in any respect. It is intended that Contractor shall, in all instances, be and remain an independent contractor responsible for its own actions and for its own agents, employees and representatives. In this respect, the parties hereby acknowledge that the Company shall only have the right to prescribe and designate the result to be accomplished, and that Company does not retain any supervisory control or authority or right to direct or control any part of the work to be performed by Contractor. Actions taken by Company relating to any part of the work to be performed by Contractor hereunder, if any, shall be suggestions only and may be accepted or rejected by Contractor, and shall in no instance be the basis for the recognition of a right or duty in Company to direct or control the details of Company's performance.

This paragraph expressly states that Parsley may make "suggestions" that "may be accepted or rejected" by Total, but that Parsley lacks the "right to direct or control any part of the work…" Furthermore, paragraph 8 of the Parsley-Total MSA expressly provided that Total is "<u>responsible</u> for its own actions and <u>for its own agents, employees and representatives.</u>" *Id.* (emphasis added).

---

gas industry and did not supply mass labor. Placing consultants on an individual, consultant-by-consultant basis was just one of Total's many activities. *Prop.-Owners Ins. Co. v. Parke*, 2016 U.S. Dist. LEXIS 125295, at *10-11 (N.D. Ind. Sep. 14, 2016) (crane company that provided worker is not "labor leasing firm").

## V. TOTAL'S BUSINESS IN THE OILFIELDS

For nearly twenty years, Total offered a wide variety of services such as "onsite drilling consultants", "in-house engineering", "total project management", consultants for "production operations", consultants for "construction", "regulatory services", and many other services. (APPENDIX713-725). Total dissolved on November 16, 2023. (APPENDIX726-729).

## VI. TOTAL RETAINED RAMIREZ AS AN INDEPENDENT CONTRACTOR

Nine years into the MSA-based relationship between Total and Parsley, on June 9, 2017, Total hired Daniel Ramirez as a 1099 independent contractor under a Consultant Master Services Agreement (previously identified as the "Total-Ramirez Consulting Agreement"). (APPENDIX731-736). That agreement makes Ramirez an independent contractor responsible for his own work. (*Id.* at para. 9). Total also retained the right to provide "instructions" and perform "observation[s] [and] "inspection[s]." (*Id.*).

Ramirez testified that he initially sought out Parsley after hearing from an acquaintance that Parsley needed consultants. (APPENDIX762, p. 25, Lines 2-9). He then spoke with a Parsley employee who he had previously worked with at a different company. (APPENDIX761 at p. 24, Lines 9-25 to p. 25, Lines 1-25). After that talk, the Parsley worker pointed Ramirez to Total because Total was the "only one[] that has an MSA with Parsley, so that was the only firm [he] could go through." (APPENDIX760 at p. 23, Line 22-25 to p. 24, Line 1-2).

In the discovery answers and appellate briefs, Total described the Ramirez retention as follows:

> [Total] found and contracted with Ramirez. Ramirez was at the Well at the request of and for Parsley.

(APPENDIX1235, Request to Admit #7).

## VII. THE UNDERLYING SUIT

On November 19, 2017, David Salmons, an employee of another subcontractor named Lone Star, became permanently paralyzed when he fell from a power swivel. (APPENDIX1042). The power swivel was being operated by Lone Star at the time. *Id.* Additionally, Ramirez testified that it was his decision to utilize the power swivel. (APPENDIX991, p. 254, Lines 16-25). Salmons then filed suit against Total, Ramirez, Parsley and Oilfield Fishing and Rental ("OFR") (another subcontractor). Lone Star was not named a defendant because of the worker's compensation bar.

## VIII. RELEVANT DEFENSES AND TENDERS

Federal agreed to defend Parsley. James River agreed to defend Total and Ramirez. The suit was heavily litigated with both Federal and James River participating.

Initially, Lone Star declined to defend and indemnify OFR and Parsley despite there being a broad master service agreement between Parsley and Lone Star. After litigation initially filed by Parsley, Lone Star agreed to defend and indemnify OFR and Parsley. (APPENDIX11, para. 21). Lone Star hired James Payne to defend Parsley. (*Id.*). Federal later added Josh Nicholls as co-counsel.

The trial court ruled in favor of Total and Ramirez after the bench trial, ruling that Lone Star owed defense and indemnity to Total and Ramirez. The appellate court affirmed. Notably, the appellate court adopted Total's and Ramirez's formulation that Ramirez was an independent contractor. *Lone Star Well Serv. LLC v. RMTDC Operations*, 731 S.W.3d 93, ft. 5 (Tex. App.--Eastland 2026, no pet.). ("Total states that it "provided [Ramirez], an independent contractor, as the company man for the Patterson Well under a well consultant agreement.").

## IX. SETTLEMENT

At the conclusion of the September 17, 2024 mediation of the Lawsuit, Salmons agreed that he would settle for a global amount of $25,000,000 from all defendants and all carriers. (APPENDIX11-12, paras. 26-31). All the carriers agreed to the requested contributions from them to meet the $25,000,000 global demand, except for James River, who initially refused to participate. James River then offered to contribute just $1,000,000. (APPENDIX12, paras. 31-32; APPENDIX1130).

## X. FEDERAL STEPS UP FOR PARSLEY AND THE INSURERS RESERVE RIGHTS

Later, James River increased the amount it was willing to pay for Ramirez and Total to $3,000,000. With the settlement opportunity set to expire, Federal received significant pressure from its named insured Parsley, Parsley's defense counsel, and the excess carriers sitting above Federal, to contribute all amounts necessary to bridge the gap and satisfy the settlement amount demanded by Salmons. (APPENDIX5, para. 17; APPENDIX47; APPENDIX49; APPENDIX 54; APPENDIX69; APPENDIX73; APPENDIX76). Given these circumstances, and to protect its named insured Parsley, Federal agreed that it would pay an additional $3,000,000 (on top of its preexisting $10,500,000 commitment) to settle the claims.

Federal contemporaneously reserved rights against James River. (APPENDIX84-86). James River also reserved rights. (*Id.*). The final settlement agreement also provided that all insurers reserved rights. (APPENDIX1137, para. VIII).

## ARGUMENT AND AUTHORITIES

### I. FEDERAL MOVES FOR SUMMARY JUDGMENT ON THE CLAIMS IN ITS COMPLAINT

Consistent with the Court's scheduling order (ECF 31), Federal moves for summary judgment on the claims in its Complaint, which assert that Parsley is entitled to coverage on the primary and excess policies issued to James River. [2] In the interests of efficiency, Federal will not restate all the positions which are fully briefed in Federal's opposition (ECF 39) to James River's affirmative motion for summary judgment (ECF 38).

Stated concisely, the James River policies offer coverage to Parsley if a written contract exists requiring Total to add Parsley as an additional insured and if the liability arises out of Total's operations for Parsley. There is no dispute that the Parsley-Total MSA requires Parsley to be added as an additional insured. And, as described more fully in Federal's response (contemporaneously filed with this brief), the Salmons liability arose out of Total's work for Parsley because Total contracted with and provided Ramirez to Federal and Salmons contended Ramirez was one of the causes of his accident.

### II. JAMES RIVER'S CLAIMS FAIL AS A MATTER OF LAW BECAUSE RAMIREZ WAS NOT AN EMPLOYEE OF PARSLEY AND DID NOT QUALIFY AS AN INSURED UNDER THE FEDERAL POLICY

James River's claims are all dependent on its theory that Ramirez qualified as an insured under the Federal policies issued to Parsley, specifically under the provision that extended insured status to Parsley's employees. Ultimately, James River must show that "Ramirez and Parsley were

[2] The Court's scheduling order provided for James River to file an affirmative motion for summary judgment, Federal to file an opposition, Federal to file its own affirmative motion for summary judgment, and for James River to file an opposition brief to Federal's affirmative motion. James River only moved for summary judgment on the claims asserted by Federal in its complaint, but did not move on its Counterclaim. (ECF 38).

in a contractual relationship and that, as a result of the contract, Parsley had the right to control Ramirez's work." (ECF 34, p. 8).

As this Court ruled in its order on the motion to dismiss (ECF 34), the ordinary meaning for the word "employee" applies to this question. The ordinary meaning of "employee" is "[s]omeone who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance." (ECF 34, p. 7-8).

This definition includes two components: the contract of hire and the right to control the details of the work. *Id.* Both components must be satisfied for Ramirez to qualify as an employee and for James River to prevail on its claims. However, the summary judgment evidence conclusively establishes that Ramirez cannot meet either of these elements. A failure on either one of the elements would independently justify summary judgment that James River take nothing on its counterclaims.

### A. There Is No Contract for Hire Between Parsley and Ramirez

#### 1. There is No Direct Contract for Hire

Nothing in the record supports that an express contract of hire existed between Parsley and Ramirez. To establish formation of an express or implied contract, the plaintiff must prove: (1) an offer; (2) an acceptance; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Plotkin v. Joekel*, 304 S.W.3d 455, 476 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

Ramirez worked for Total as an independent contractor under the Total-Ramirez Consulting Agreement and Total worked for Parsley as an independent contractor under the Total-Parsley MSA. Indisputably, no express relationship existed between Ramirez and Parsley.

A contract can also be implied, but the elements of an express contract and an implied-in-fact contract are identical. *Id.* There is no evidence whatsoever of conduct that Parsley and Ramirez implicitly agreed to an employment offer, acceptance, meeting of the minds, consent to the terms and delivery.

**2. There Is No Indirect Contract for Hire**

There is no express or implied contract, of any kind, between Parsley and Ramirez. Therefore, for a relevant contract to exist, it must be "indirect". An indirect contract would be between the two purported employers and that contract would make an employee of Lending Employer A into an employee of Borrowing Employer B.

However, the only relevant contracts in this case are the Parsley-Total MSA and Total-Ramirez Consulting Agreement. Both of these contracts identify Total as Parsley's independent contractor and Ramirez as Total's independent contractor and none of these contracts suggest in any way that Ramirez would be an employee of anyone. As discussed below, these agreements are controlling and their terms must be honored.

**a. Both Independent Contractor Agreements Are Controlling Because They Are Not Shams or Subterfuge**

Under Texas law, contracts defining employment relationships are to be enforced unless they are shams or subterfuge. *Irani Eng'g, Inc. v. Arcadia Gas Storage, LLC*, No. 01-21-00113-CV, 2022 Tex. App. LEXIS 6176, at *18-19 (Tex. App.—Houston [1st Dist.] Aug. 23, 2022, no pet.).[3] "A 'sham' is a trick, a deceit, a falsehood, or a fraud. *See, e.g.*, BLACK'S LAW DICTIONARY (9th ed. 2009) ('Something that is not what it seems; a counterfeit.'); THE AMERICAN HERITAGE COLLEGE DICTIONARY 1274 (4th ed. 2002) ("Something false . . .

[3] The parties could also modify the terms by subsequent agreement. *Irani Eng'g, Inc. v. Arcadia Gas Storage, LLC*, No. 01-21-00113-CV, 2022 Tex. App. LEXIS 6176, at *18-19 (Tex. App. Aug. 23, 2022). James River does not assert a later agreement supersedes the Parsley-Total MSA and Total-Ramirez Consulting Agreement.

that is purported to be genuine."); *United States v. Baker*, No. A-13-CR-346-SS, 2014 U.S. Dist. LEXIS 207064, at *6 (W.D. Tex. Apr. 11, 2014) (using same dictionary definitions).

The Parsley-Total MSA and Total-Ramirez consulting agreement are both legitimate, arms-length contracts and are the same type of agreement being entered into every day across the oil and gas industry. There is nothing about them that resembles a trick, a deceit, a falsehood, or a fraud. Moreover, both James River and Federal agree the Parsley-Total MSA and or Total-Ramirez consulting agreement are neither shams and nor subterfuge. (APPENDIX1159, p. 51, Lines 7-21; p. 56, Lines 7-9). With legitimate, everyday contracts in one hand, and the parties agreeing on their legitimacy in the other, this Court can simply enforce the contracts as written, and recognize Ramirez as an independent contractor who does not qualify for coverage.

**b. Master Service Agreements Are a Widespread, Standard Contract Throughout the Oil and Gas Industry, Where Company Men Are Independent Contractors**

Master service agreements are a widespread part of the oil and gas industry. The case law and secondary sources are full of discussion of the prominence of master service agreements. *See e.g. Case v. Omega Natchiq*, *Inc.*, No. H-08-0835, 2008 U.S. Dist. LEXIS 52931, at *6 (S.D. Tex. July 10, 2008) (Rosenthal, J.) (discussing master service agreement); *Lightering LLC v. Teichman Grp*., 328 F. Supp. 3d 625, 628 (S.D. Tex. 2018) (Rosenthal, J.) (accord); 74 CAIL Annual Institute on Energy Law § 4.01 (discussing role of master service agreements in industry); In fact, both James River and Federal agree on their widespread use. (APPENDIX1151, p. 21, Lines 16-18). See also APPENDIX3, para. 6.

Additionally, company men, also known as "completions consultants" or "well site supervisors" are typically hired as independent contractors. *GE Oil & Gas Pressure Control, L.P. v. Carrizo Oil & Gas, Inc.*, No. 01-21-00285-CV, 2023 Tex. App. LEXIS 3366, at *9 n.5 (Tex.

App. May 18, 2023, pet. denied); *Green, Inc. v. Questor Drilling Corp.*, 946 S.W.2d 907, 908 (Tex. App.--Amarillo 1997, no pet.); APPENDIX5, para. 7. Ramirez even identified himself as a "company man" and independent contractor for many other companies in the past. (APPENDIX797, p. 60-79).

Similarly, it is common in oil and gas for the company men to be separated by two layers of independent contractor agreements. The oil well owner, such as Parsley, contracts with a company like Total that provides consultants as one part of its business and Total then contracts with consultants such as company men. *Francis v. Coastal Oil & Gas Corp.*, 130 S.W.3d 76, 90 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("The evidence establishes that [company man] Bickham was an independent contractor hired by the settling defendant Acock. Acock, in turn, was an independent contractor hired by Coastal. Bickham had no contract with Coastal."); *Godines v. Parsley Energy Operations, LLC*, No. 11-16-00139-CV, 2018 Tex. App. LEXIS 3961, at *2 (Tex. App.—Eastland May 31, 2018, no pet.) (discussing Parsley hiring another placement service to provide company men and rejecting that Parsley controlled company man or site); APPENDIX3, para. 7). Again, James River and Federal agree on this point. (APPENDIX1152, p. 29, Lines 5-6).

There is no dispute that these types of contracts and businesses are totally normal in the industry. With no party contending otherwise, the Court should enforce the contracts as written.

**c. The Borrowed Employee Doctrine Has No Relevance to an Insurance Policy to Create an Indirect Contract for Hire**

As the Court previously noted, the "contract of hire" could conceivably be an indirect contract, which the Court indicated might be created under the borrowed employee doctrine. However, Federal submits that the borrowed employee doctrine is meant to apply in tort situations, not to stand in for a contract of hire in situations interpreting coverage for insurance policies.

The borrowed employee doctrine exists to deal with the liability associated with quasi, non-traditional employees who are working for someone other than their usual employer. The doctrine takes its origin from a 1908 case in which the United States Supreme Court considered whether vicarious liability should apply to a dock owner whose employee was simultaneously working for stevedore. *Vanterpool v. Hess Oil V.I. Corp*., 589 F. Supp. 334, 337 (D.V.I. 1984) (discussing history of doctrine); *Langfitt v. Fed. Marine Terminals, Inc*., 647 F.3d 1116, 1122 (11th Cir. 2011) (discussing history of doctrine). The vicarious liability cases largely deal with situations in which a plaintiff alleges a borrowing employer should be liable in the tort context for the acts of a borrowed employee. Generally speaking, the alleged borrowing employer denies it is the employer in that context so that it can defeat vicarious liability.

The other common scenario that utilizes the borrowed employee doctrine is worker's compensation. In that context, the typical scenario involves a worker becoming injured while working for an alleged borrowing employer and the injured worker wishes to sue the borrowing employer for negligence. There, the alleged borrowing employer usually asserts it is the injured person's employer in order for the employer to take advantage of the worker's compensation bar that prohibits injured employees from suing their employer.

Neither of these situations are present here. Instead, the situation is that veterans of the oil and gas industry entered in arms-length, standard contracts that defined their roles. This situation is so vastly different from the purpose of the borrowed employee doctrine that the Court should only be looking to the contract and not to the common law. *Dillon Gage Inc. of Dall. v. Certain Underwriters at Lloyd's, Subscribing to Policy No. EE1701590*, 440 F. Supp. 3d 587, 593 (N.D. Tex. 2020) ("[C]ommon-law default can be confirmed or displaced by [insurance] contract with an anti-concurrent-causation clause."); *Hassell Constr. Co. v. Springwoods Realty Co*., No. 01-17-

00822-CV, 2023 Tex. App. LEXIS 1449 (Tex. App.—Houston [1st Dist.] Mar. 7, 2023, pet. denied) (allowing contract to modify the common law regarding the accrual date for a breach of contract claim).

### B. Parsley Treated Ramirez As An Independent Contractor, and Parsley Did Not Assert Control Over The Details of Ramirez's Work

Assuming *arguendo* that a contract of hire exists, in order for Ramirez to be an employee, Texas law requires that the contract must also give Parsley the "right to control" the details of the employee's work. *See Stimson v. Aetna Ins. Co.*, 440 S.W.2d 108, 111 (Tex. App.—Dallas 1969, no writ) ("[T]he test is the right of control, not the exercise of control by the person alleged to be the employer."). As the Court explained in its prior ruling, "there must be a contractual link between the employee and the employer that grants the employer the right to control the employee's work." (ECF 34, p. 8) (emphasis added).

Here, there is no contractual link and the contracts make Ramirez an independent contractor. The Parsley-Total MSA makes Total responsible for Ramirez and the Total-Ramirez Consulting Agreement makes Ramirez responsible for himself (while preserving Total's rights to observe, inspect, and comment). (APPENDIX658, para. 9). The situation created by the contracts is a situation where Ramirez, as an independent contractor, was in control of his own work. As the Court previously ruled, the "express contract usually controls." (ECF 34, p. 10). Here, there is no reason to reach a different conclusion because the evidence demonstrates that Parsley did not control Ramirez.

Moreover, any consideration of the on-the-ground evidence of control needs to be balanced against the Texas legal framework that recognizes independent contractor relationships. When a company hires an independent contractor, the contractor controls his own work. Therefore, it is

not a binary choice between Total or Parsley as to who controlled Ramirez. Instead, Ramirez is an independent contractor who Texas law recognizes can control himself.

### 1. Parsley Did Not Control Ramirez in Practice

As the Court discussed in its prior order, "[e]xercise of control over an employee's work may be relevant to whether an alleged employer has a right to control, but the value of such facts is "evidentiary only." (ECF 34, p. 10). Exercise of control is "not the ultimate test," even if it "may be the best evidence available in determining the [r]ight of control." *Id.* (ECF 34, p. 8). Additionally, "the assumption of exercise of control must be so persistent and the acquiescence therein so pronounced as to raise an inference that when the accident occurred, the parties by implied consent had agreed that the principal might have the right to control the details of the work."). *White v. DR & PA Deliverance, Ltd*., No. 01-12-00227-CV, 2014 Tex. App. LEXIS 2091, at *5-6 (Tex. App.—Houston [1st Dist.] Feb. 25, 2014, no pet.).

Here, there is also no evidence to support Parsley possessing a persistent right to control or acquiescing to Parsley "controlling" him. Ramirez testified that he already knew how to do his job, received "no instruction" from Parsley while only receiving "bullet points" (APPENDIX973 p. 236, Lines 7-9), decided on his own how to drill the well and what orders to give (APPENDIX973, Lines 20-25; APPENDIX992, Lines 16-24 to APPENDIX993, Lines 1-7), had sole discretion over the operations (APPENDIX992, Lines 1-8), and received a big picture "goal for the particular project and ending point, and [he] got to decide how to get there…" (APPENDIX992, Lines 9-15). Ramirez viewed being a consultant as being far field from being loyal to an employer or vice versa. Instead, he testified that he was a "mercenary" with "no allegiance" to companies, and who didn't care what happened with Parsley. (APPENDIX794, Lines 2-19).

Ramirez did give some generalized testimony in response to broad questions at the end of his six-hour deposition. For example, when asked if he was "just like an employee", he said yes. (APPENDIX983, p. 246, Lines 14-16). Similarly, he said yes when asked if Parsley had the "right to control" him. (APPENDIX996, p. 259, Lines 2-3). However, these kinds of general, conclusory depositions statements about the ultimate issues do not give rise to a genuine issue of material fact and can be disregarded. *Clark v. America's Favorite Chicken Co*., 110 F.3d 295, 297 (5th Cir. 1997) ("Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment.").[4]

The lack of import to these kinds of deposition statements is especially true when there are specific, concrete answers to rely upon such as Ramirez's testimony about knowing how to do his job without instruction and deciding to use the power swivel without Parsley's input. (APPENDIX991, Lines 20-25). For example, in *Quintanilla v. A & R Demolition, Inc*., No. H-04-1965, 2006 U.S. Dist. LEXIS 12264 (S.D. Tex. Mar. 6, 2006) (Rosenthal, J.), the court refused to allow similarly undetailed testimony about an ultimate question to create a genuine issue of material fact. In that case, there was more specific testimony in the record about the details of an employment relationship and that more specific testimony contradicted the summary, conclusory testimony about the ultimate question. *Id.* at *8-9.

**2. Parsley's Interactions with Ramirez Did Not Make Him an Employee**

Obviously, Parsley interacted with Ramirez, who was working on the Parsley site. For example, Ramirez would submit reports to Parsley, Parsley allowed him to use a laptop, Parsley

[4] Conclusory testimony would also not trump the right of control provided for in a contract.

sent him guidance to start the job, and Parsley would give Ramirez his work shifts. (APPENDIX973, Lines 1-25 to APPENDIX976, Lines 1-7; APPENDIX981p. 1-25).

However, Texas cases have already ruled that none of these kinds of activities convert an independent contractor to a borrowed employee. *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 295 (Tex. 2004) ("It has long been the rule that a right to receive reports is not a right to control."); *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606-07 (Tex. 2002) (rejecting argument that Dow had a right to control by virtue of requiring Bright to comply with Dow's rules and regulations.); *Johnston v. Oiltanking Houston, L.P.*, 367 S.W.3d 412, 419 (Tex. App.—Houston [14th Dist.] 2012, no pet.) a right to direct when to start, stop, or resume work does not impose liability.); *Ellwood Tex. Forge Corp. v. Jones*, 214 S.W.3d 693, 700 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (a right to inspect progress is insufficient to establish a right of control.); *Bell v. VPSI, Inc.*, 205 S.W.3d 706, 714, 720 (Tex. App.—Fort Worth 2006, no pet.) (The right to ensure compliance with applicable practices, laws, and regulations that relate to performance of the agreement are not evidence of a right to control the details of the work.).

This law makes sense because it would be impossible for an entity to never interact with its independent contractors. Even a homeowner who hires am experienced general contractor to build an entire home would need to interact with the contractor to some degree in order to ensure the job is done. *Domino's Pizza, L.L.C. v. Reddy*, No. 09-14-00058-CV, 2015 Tex. App. LEXIS 2578, at *14-15 (Tex. App.—Beaumont Mar. 19, 2015, pet. denied) (no conversion of independent contractor to employee where employer retained right to terminate the franchise agreement, receive evaluations and other reports, conduct inspections, force compliance with procedures, prescribe alterations and deviations to work, set general minimum operational standards).

### 3. Even If Parsley Did Assert Some Sort of Control Over Ramirez, The Borrowed Employee Doctrine Does Not Apply Because Texas Law Requires That the Alleged Control Must Cause the Accident

Assuming *arguendo* that Parsley controlled some aspect of Ramirez's work, the borrowed employee doctrine would not be satisfied because these alleged types of control did not cause Mr. Salmons' injury. According to the expert utilized by Mr. Salmons, Ramirez acted negligently in the following ways to cause Salmons' accident on the power swivel:

- Failed to ensure Salmons was informed of all the hazards
- Asked Lone Star crew to use a power swivel perform operations outside the normal course
- Failed to know key workers' training and skill levels
- Failed to ensure Salmons attended the safety meeting
- Failed to ensure all crew members met the safety requirements
- Failed to follow proper procedures and safety concerns

(APPENDIX1061-62).

Under Texas law, for the borrowed employee doctrine to apply, Parsley's alleged control needed to be specifically related to the Salmons accident. Showing Parsley controlled one aspect of Ramirez's activities does not create a borrowed employee relationship if the injury in question arose from another. *Am. Nat'l. Ins. Co. v. Denke,* 95 S.W.2d 370, 373 (Tex. 1936) (emphasis added) ("[T]he test of one's liability for the act…of his alleged servant is his right and power to direct and control his imputed agent in the performance *of the causal act or omission at the very instant of the act or neglect*."); *GE v. Moritz*, 257 S.W.3d 211, 214 (Tex. 2008) (accord).

Here, none of Parsley's alleged control is specifically connected to Salmons' accident on the power swivel. Ramirez is alleged to have, among other things, failed to know the different workers' experience levels and skill sets. Parsley's transmission of general guidelines, provision of a laptop, receipt of daily reports, and other unrelated activities bear no specific connection to the Salmons accident on the power swivel being operated by Salmons' employer, Lone Star.

Even if Parsley was exerting some sort of control of Ramirez, it did not give Ramirez any direction at all about the power swivel from which Salmons fell. Instead, Ramirez testified that he himself made the decision to use the power swivel and no one at Parsley instructed him to do so. (APPENDIX992, Lines 16-24 to APPENDIX993, Lines 1-7).

As a result, there is no evidence of control by Parsley that would justify ignoring the contractual terms regarding control of Ramirez's work. Federal is accordingly entitled to summary judgment that James River take nothing by way of its claims. *Nat'l W. Life Ins. Co. v. Newman*, No. 02-10-00133-CV, 2011 Tex. App. LEXIS 8184, at *22 (Tex. App.—Fort Worth Oct. 13, 2011, pet. denied) ("Newman does not claim that National Western retained the right to control how Strickland procured applications or accepted payments. Instead, Newman focuses on the fact that National Western's referral procedure resulted in Strickland being sent to Newman's home. The referral to Newman's home was not, however, the injury-producing event.").

## III. ALTERNATIVELY, IF THE COURT RULES THERE IS A FACT ISSUE ABOUT WHETHER COVERAGE EXISTS UNDER THE FEDERAL POLICY, THEN JAMES RIVER AND FEDERAL ARE CO-INSURERS AND THE LOSS MUST BE ALLOCATED PRO RATA BY LIMITS

If the Court determines a fact issue exists as to whether Ramirez qualified as an employee under the Federal policies, Federal seeks summary judgment that Federal and James River are co-insurers such that the burden of coverage for Ramirez should be allocated among them.

James River owes coverage to Ramirez as a matter of law. The James River Primary Policy extends insured status to "independent contractors…as respects work performed within the course and scope of their employment for the Named Insured…" (APPENDIX557 (emphasis added).[5]

[5] Ramirez would also be an insured under the James River excess policy because it adopts all the insureds of the primary policy.

It is undisputed that Ramirez is an independent contractor of Total under the Total-Ramirez Consulting Agreement. Additionally, for the reasons described at pages 10-14 in Federal's opposition (ECF 39) to James River's motion for summary judgment, Ramirez performed work in the scope of his employment for Total. Stately concisely, Total retained Ramirez and provided him to Parsley as part of the goods and services Total performed for Parsley. Accordingly, Ramirez is an insured under the James River policy as a matter of law.

In the event it is determined that Ramirez also qualified as an insured under the Federal policy, James River and Federal would be co-insurers with conflicting other insurance provisions. *Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exch.,* 444 S.W.2d 583 (Tex. 1969).

The Parsley and Total insurance profile is:

| **Insurer** | **Named Insured** | **Primary Limit** | **Excess Limit** | **Original Settlement Payment for Named Insured** |
|---|---|---|---|---|
| Federal | Parsley | $1M | $20M | $13.5M |
| James River | Total | $1M | $10M | $3M |

Both the primary policies are exhausted and an allocation must occur with the excess policies. For example, assuming that James River paid the entire $3,000,000 settlement for Ramirez, with $0 for Total, James River's payment would be split 1/3 to James River ($10M excess policy) and 2/3 to Federal ($20M excess policy).

## CONCLUSION

For the reasons stated in this brief and in ECF 39, this Court should grant summary judgment in favor of Federal on the claims in the Federal Complaint (ECF 1) and on the counterclaims contained in James River's Counterclaims (ECF 24). First, Parsley qualifies as an insured under the James River policies because the Salmons liability arose out of Total's operations for Parsley. Total retained Ramirez as an independent contractor and then sent him to Well. After Salmons became injured, he alleges that Ramirez was one of the causes of his injury.

Second, James River's counterclaim that Ramirez is an "employee" of Parsley should be wholeheartedly rejected. The definition for an employee requires there to be a direct or indirect contract of hire between Parsley and Ramirez and that contract must provide Parsley the right to control Ramirez. Indisputably, no direct contract exists between Parsley and Ramirez. Similarly, no indirect contract exists because the Parsley-Total MSA makes Total an independent contractor and the Total-Ramirez Consulting Agreement makes Ramirez an independent contractor. Both of these agreements are industry-standard, arms-length deals that should be respected. Additionally, no right of control exists because the contracts make Total responsible for its workers and Ramirez responsible for his own work. The reality also matched the contract because Parsley treated Ramirez as an independent contractor at the Well and recognized that he controlled his own work.